Filed 4/21/25  P. v. Page CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098342 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE000438) |
| v. | |
| BRELEN PAGE, | |
| Defendant and Appellant. | |

On New Year's Day 2020, the victim was with his young daughter in the parking lot of an apartment complex on Traction Avenue near Triangle Park in Sacramento.  A Ford Expedition drove by several times.  On the fourth pass, the Expedition stopped, the driver fired multiple gunshots out the window, and the vehicle drove off.  The victim died from a gunshot wound to the head.

The area around Triangle Park where the shooting occurred is described by law enforcement as Del Paso Heights Bloods gang territory.  This shooting occurred the day after a member of the Oak Park Bloods was killed by the rival Del Paso Heights Bloods.

1

Law enforcement quickly connected the Ford Expedition to defendant Brelen Page, a self-described "affiliate" of the Oak Park Bloods who also "claim[ed] FAB," referring to an Oak Park Bloods subset. Defendant's brother, Marc Page (Marc)[1], was a validated member of the Oak Park Bloods. At trial, defendant did not dispute that his Expedition was the vehicle used in the shooting or that the gun found in his Expedition was the weapon used in the shooting. However, he testified that, shortly before the shooting, Marc, who is now deceased, had driven off with his vehicle.

A jury found defendant guilty of murder in the first degree and found true the allegations that the murder was perpetrated by means of discharging a firearm from a motor vehicle and that, in committing the murder, defendant personally discharged a firearm causing death. The trial court sentenced defendant to life without the possibility of parole and an additional 25 years to life for the firearm enhancement.

On appeal, defendant argues the trial court prejudicially erred in (1) admitting TraX program evidence that purported to illustrate the approximate location of his cell phone at relevant times, (2) permitting Daniel Garbutt to testify as an expert user of the TraX program, (3) admitting into evidence a picture drawn by a witness to the shooting depicting the victim on the ground with blood coming from his head and with his young daughter on top of him, and (4) admitting gang evidence. He further argues that, even if these errors were not individually prejudicial, their cumulative effect requires reversal. Finally, he argues that the abstract of judgment must be corrected to delete a parole revocation restitution fine which was not imposed by the trial court and is not authorized.

We agree that the abstract of judgment must be corrected, but otherwise affirm.

---

[1]     Given the shared surname, we will refer to defendant's brother by his first name and mean no disrespect.

BACKGROUND

A felony complaint deemed information charged defendant in count one with murder (Pen. Code,[2] § 187, subd. (a)), alleged the special circumstance that the murder was perpetrated by means of discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)), and further alleged that, in committing the murder, defendant personally discharged a firearm causing the victim's death (§ 12022.53, subd. (d)). Count two charged defendant with carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1)), but, during the trial, the trial court granted the prosecution's motion to dismiss count two in the interest of justice.

*The Prosecution*

*The Shooting and the Victim's Death*

L.G.[3] testified at trial against his will because, as he put it, he lived in a dangerous neighborhood, and "people get killed for being witnesses in crimes." L.G. testified that he lived in an apartment complex on Traction Avenue. On January 1, 2020, he was with his girlfriend in his vehicle in the parking lot. The victim was in the parking lot with his young daughter and her mother. At some point, L.G. heard about six gunshots. He saw a Ford Expedition or Explorer, and he believed the shooting came from that vehicle. L.G. testified that he did not see the shooter. After the shooting, L.G. saw the victim on the ground and his daughter was on top of him. However, he also testified the victim was not holding his daughter.

M.G. lived in an apartment complex on Traction Avenue. At approximately 2:30 or 2:40 p.m. on January 1, 2020, she was in the parking lot when she noticed a white Ford Expedition driving back and forth on Traction Avenue. She saw it drive by three times.

---

**2** Undesignated section references are to the Penal Code.
**3** To protect their privacy, we refer to the witnesses and other mentioned individuals by their initials. (Cal. Rules of Court, rule 8.90(b)(10).)

The driver was a black male in his 20's. At some point, M.G. heard at least six gunshots. She saw the Expedition stopped on Traction Avenue with the driver's window down. The gunshots were coming from the vehicle, although M.G. did not see the gun because the gun was not extended outside of the vehicle. During the shooting, M.G. could not see the driver. After the shooting, the vehicle drove off towards the south. M.G. called 911 and then ran over to help. There was a male on the ground who had been shot through his left temple.

M.G.'s 911 call was played for the jury. She reported multiple gunshots at the address on Traction Avenue and that there was a man down with a gunshot wound to the head. She reported that someone had driven by four times, stopped, opened his window, and fired five or six gunshots. She reported that the assailant drove off in a white Ford Expedition.

At approximately 2:54 p.m., Sacramento Police Officer Micah Kraintz personally heard six or seven gunshots. He got into his patrol vehicle and learned that there had been an activation by ShotSpotter—a system that detects gunfire—on Traction Avenue. Officer Kraintz drove toward the address and arrived in three to four minutes. There, he saw a male on the ground with a gunshot wound to his head. Officer Kraintz learned that the shooter had been driving a white Ford Expedition, and he broadcasted that information. At the scene, police found one nine-millimeter Hornady cartridge casing and one expended bullet.

The victim suffered a bullet wound to the right side of his forehead. He died as a result of the gunshot wound.

*The Initial Investigation*

Officer Christopher Jensen learned of the ShotSpotter activation on Traction Avenue near Triangle Park at approximately 2:54 p.m. He reviewed video surveillance from an apartment building on Traction Avenue. On the video, Officer Jensen observed a white Ford Expedition traveling north on Traction Avenue. A minute later, the Expedition

4

could be seen traveling south on Traction Avenue. The vehicle did not have a front license plate, and it had something light in color dangling from the rearview mirror and something puffy covering the steering wheel. The driver's window was down, and the rest of the windows were tinted. About a minute later, the Expedition could be seen again traveling north on Traction Avenue. There was something on the back bumper hanging down, perhaps a license plate light. Additionally, there was some damage to the rear bumper. The vehicle traveled out of the view of the surveillance video, but returned traveling south once again. The vehicle stopped for approximately nine seconds and then accelerated quickly. The driver appeared in one of the surveillance recordings. He was an adult black male wearing a black T-shirt.

Officer Jensen was able to discern part of the Expedition's license plate number, and he captured a still photograph of the plate. He gave the photograph to Officer Arian Terman who performed a search on a license plate reader database. Officer Terman searched for a 2003 to 2006 Ford Expedition with a license plate corresponding to the partial plate. One of the results stood out as matching the surveillance footage, including the wire hanging down by the rear license plate. Officer Jensen performed a Department of Motor Vehicles records check for that vehicle and discovered it was owned by a certain individual but that there was a release of liability to defendant dated April 1, 2019.

Sergeant Jeffrey Griggs was able to track the path of travel of the Expedition after it left Traction Avenue using traffic surveillance cameras. The Expedition left Traction Avenue and drove onto Del Paso Boulevard southbound, which eventually turned into 12th Street into downtown Sacramento. Cameras picked up the Expedition at 9th Street and Capitol Avenue, traveling south. Approximately 20 minutes later, it passed a license plate reader at Riverside Boulevard and Broadway. This represented the biggest gap between times when the Expedition was spotted on traffic cameras. The Expedition next appeared at McClatchy Park just before 4:00 p.m.

In surveillance video recorded at McClatchy Park at approximately 3:52 p.m., just under an hour after the shooting, the Expedition stopped, an individual on a basketball court interacted with the driver, and the person at the basketball court took his shirt off. The driver of the Expedition was wearing a black shirt. He appeared to be an adult in his 20's weighing 200 pounds or more. Sergeant Griggs described a selfie-style video he would eventually view that had been recorded on defendant's cell phone that also related to this interaction. In the video, defendant was at McClatchy Park in his Expedition and described how he had made someone take off the shirt he was wearing that had the word "germ" printed on it.

*Subsequent Interviews of Witnesses to the Killing*

Sacramento Police interviewed M.G. at the police station, and the recorded interview was played for the jury. She described the person in the white Ford Expedition as a Black male. He appeared to be stocky or heavy. However, she could not discern features such as hair or facial hair. She stated that it looked like he had shorter hair, but also thought it possible that his hair was back or against the car's headrest.

Police later had M.G. look at a photo lineup. She gravitated to two photographs, one of which was a photograph that appeared twice in the six-pack photo lineup, a law enforcement mistake. It was not, however, defendant's photograph that appeared twice. M.G. had not been 100 percent certain when she reviewed the photo lineup but she "did feel pretty strongly on one." She was most inclined towards defendant's photograph as a possible match to the shooter. A photograph of Marc did not appear in the photo lineup.

Sergeant Todd Culp interviewed L.G. on the evening of January 1, 2020. L.G. did not want to be seen cooperating with law enforcement, so they met at a store and then went to police headquarters. When Sergeant Culp entered the interview room where L.G. was waiting, he saw that L.G. had drawn a picture of a male pointing a gun out of a vehicle's window. L.G. told Sergeant Culp he had drawn the shooter. L.G. said he had looked the shooter "dead in the face," and the drawing was the shooter. L.G. had drawn

6

another picture, of a man lying on the ground, holding a baby, with blood coming from its head. Text on the page said, "Even holding a baby, we are not safe." (Some capitalization omitted.) L.G. told Sergeant Culp that the picture represented the victim.

Sergeant Culp's recorded interview with L.G. was played for the jury. L.G. told police that he was sitting in the driver's seat of his truck facing Traction Avenue when someone pulled up in an Expedition. L.G. ducked down when the shooting started. L.G. stated that he had been ten to fifteen feet from the shooter and he looked the shooter "dead in his face." L.G. described the shooter as a heavyset adult Black male with a "fat face." He had a beard and mustache that did not connect. He was in his 20's or 30's and was wearing a black shirt. L.G. could not tell "exactly how his hair was." He could have been wearing a beanie or could have had longer dreads. L.G. estimated that the shooter fired seven or eight shots. He did not extend his gun out the window so that the cartridge casings would land inside the vehicle. L.G. told police the shooter was "ripping them off" "like he was taking his time" and was not shooting wildly. The shooter "waited till his hand got set back right to shoot again." The shooter never looked at L.G. Instead, he "appeared laser focused on" the victim. Sergeant Culp showed L.G. 30 photos of individuals that matched the description he gave of the shooter. Defendant's photograph was not among the three L.G. separated from the others as possibly being the shooter.

At trial, L.G. denied telling police that the shooter was a black heavyset male with a beard in his late 20's or early 30's, perhaps wearing a beanie or with his hair up. L.G. testified he "was trying to throw them off so they wouldn't ask me no questions. I felt like if I gave them bad answers, they would leave me alone." L.G. also testified that he did not tell police that he looked the shooter in the face, and further that a picture he drew was of himself in a car holding a gun, not the shooter, just to get the police "off [his] case." Sergeant Culp testified, however, that L.G. never told him that L.G. had drawn himself as the shooter. L.G. also denied drawing the picture of the victim's body on the ground with blood coming out of his head and holding a baby.

7

*The Apprehension of Defendant and Recovery of Evidence*

At approximately 11:50 p.m. on January 1, 2020, Detective Joseph Thebeau located the Ford Expedition by South Land Park near defendant's apartment. At approximately 4:45 a.m., defendant came out of the apartment and police took him into custody. Defendant consented to a search of the Expedition, but police did not find anything.

Police later conducted a second search of the Expedition pursuant to a warrant. They found a nine-millimeter Beretta Nano handgun and a box of ammunition beneath the center console. They also found two expended nine-millimeter cartridge casings, one a Hornady brand and the other a Luger brand. Defendant's Social Security card was in the glove compartment.

A supervising criminalist testifying as an expert in firearms analysis testified that he examined the Beretta BU9 Nano nine-millimeter firearm and three fired cartridge casings. All three cartridge casings were fired using the submitted firearm.

*Y.T.'s Account of Events on January 1, 2020*

Marc's former wife, Y.T., was with Marc for approximately two years until Marc died in February 2021. Y.T. admitted she had been convicted of two crimes of moral turpitude. She also admitted she was formerly a member or affiliate of the Oak Park Bloods. She was able to demonstrate a gang sign for Hellgang, an Oak Park Bloods subset.

Y.T. testified that defendant and Marc looked similar. She believed Marc used defendant's identification on occasion. She was not sure whether Marc had used defendant's identification to visit her in county jail, but she was surprised when Marc visited her while in jail because he was on parole at the time and as such would not have been allowed to visit. Y.T. also testified that defendant never let Marc use his SUV because Marc did not have a driver's license.

8

As of December 31, 2019, Y.T. and Marc were staying in defendant's apartment. Sometime after 2:00 p.m. on January 1, 2020, Y.T., Marc, and defendant went to the house of a friend, R.H., in Tahoe Park. According to law enforcement, around this time R.H. was spending time at an address on 59th Street. At some point, defendant left for a while because "he had to go do something." Y.T. and Marc walked to a liquor store around the corner from R.H.'s house. Sometime after 5:00 p.m., defendant gave Marc and Y.T. a ride from R.H.'s house to buy a car. Defendant waited while Marc and Y.T. made the purchase and then he left. Y.T. and Marc eventually went back to defendant's apartment.

Y.T. testified that, from the time she woke up on January 1, 2020, until she was awoken by police the next morning, she and Marc were never apart. He never left her side. She was with him the whole time. Y.T. testified she and Marc were not in the area where the shooting occurred on January 1, 2020, and Marc did not shoot anyone.

*Gang Evidence*

Marc, defendant's brother, was a validated Oak Park Bloods member. Traditional enemies of the Oak Park Bloods include Del Paso Heights Bloods to the north and Starz, among others, to the south. The location around Triangle Park on Traction Avenue, where the shooting occurred, was described by law enforcement as Del Paso Heights Bloods territory and as a Del Paso Heights Bloods stronghold.

H.C., an Oak Park Bloods member, was murdered on December 31, 2019, the day before the shooting at issue here. Y.T. testified that both Marc and defendant knew H.C. and that everybody was upset he was murdered. One of Marc's social media posts included a picture of H.C. and stated, "Over you I want them all dead[.] Love you blood[.] I can't stop crying."

In one photo from defendant's social media account, Detective Patrick Klutz identified Marc throwing up a hand sign for Hellgang. Another photograph contained text reading, "I'm from Oak Park and I can't keep calm." The post had two pictures of a

hand holding a pistol. In the corner of the photograph there appeared "30K." According to Detective Klutz, 30K "stands for 30 Killer," a reference to the 30 Boyz that originated from the Meadowview gangs. "Oak Park and their allies will commonly throw up 30K or put a 30K at the end of their screen names, saying they are 30 Killer, in reference to killing Meadowview or south area gangs." Thus, according to Detective Klutz, a "30K" tattoo would indicate allegiance to the Oak Park Bloods. Also, at the bottom of the photograph appeared the number 612. Those digits corresponded to letters of the alphabet and thus spelled out "FAB" which stood for Fourth Avenue Bloods, a subset of the Oak Park Bloods. Sergeant Dave Putman testified he was able to access defendant's cell phone by successfully guessing the code, which was 612612. Sergeant Putman testified that one video he observed on defendant's cell phone showed a gun that matched the gun found in the Expedition, and it was being held in a hand that looked like defendant's hand "with tattoos and other things on it."

A social media post on defendant's cell phone showed an individual who was murdered in 2019, and two individuals who were incarcerated. All three individuals were associated with the Oak Park Bloods. Another photo showed defendant in the Expedition. In the photo, defendant was throwing up a hand sign for Hellgang. Sergeant Putman also testified about another video in which defendant was handling the Beretta Nano handgun that was found in the Expedition. Another video on defendant's cell phone showed the Beretta and the serial number was visible.

A text message sent from defendant's cell phone on January 1, 2020, at 11:44 p.m., stated: "[G]o slide through and slap some bitch i aint gone lie i been on some hotshit this hole week on fab." Sergeant Putman testified "slide" usually means driving through enemy territory or enemy locations. "Slap some bitch" "is a code for shoot someone." Sergeant Putman continued, " 'I'm on some hot shit' means 'I'm upset', and 'on FAB' means, 'I am representing for the gang.' " The recipient responded: "That's what I was thinking see what hype nights is on rn." Defendant's cell phone responded, "dont do nun

10

[*sic*] stupid just see who out their [*sic*]. . . slap it drive off normal dont speed." The prosecutor asked Sergeant Putman if this exchange was a good description "of what happened on Traction Avenue that day," and Putman responded, "I would say that's almost an exact description."

<em>The Defense</em>

Defendant testified he was an "affiliate" of the Oak Park Bloods. He considered himself part of the Oak Park Bloods. He also acknowledged that he "claim[ed] FAB," a subset of the Oak Park Bloods. However, he testified that he never committed crime for the benefit of the gang. He had tattoos that could be deemed gang-related. He had tattoos of "Hellgang, 612, 2126, that stuff." Defendant testified that law enforcement was correct that "612" referred to FAB.

On defendant's hands, he had tattoos of the names of friends who had died, in addition to certain symbols. Defendant just considered them "having friend tattoos and stuff like that." One of his tattoos of a deceased friend included "30K or 30 gang killer or whatever." Defendant testified that, when he got the tattoo, he did not know 30K meant "30 killer" in reference to a subset of Starz or Meadowview that is called 30 Boys. The individuals memorialized in his tattoos included gang members, "affiliates" and "associates."

Defendant discussed on cross-examination three individuals about whom he had posted online. One of the individuals had been shot and killed by rival Del Paso Heights Bloods, and the other two were incarcerated and were Oak Park Bloods members. Defendant also acknowledged that 612 and 30K tattoos could be interpreted as flagging oneself as an Oak Park Bloods member.

Defendant testified that he sometimes would be mistaken for Marc. Because he looked like Marc, he had almost been jumped a couple of times, and he got into fights in jail, which defendant attributed to Marc's gang membership.

11

Turning to the events of January 1, 2020, defendant testified he woke up at 10:00 or 11:00 a.m. Marc and Y.T. were at defendant's apartment. Defendant and Marc agreed they would go to their friend R.H.'s house, and then defendant and R.H. intended to go to Miller Park for a car show. Marc wanted to borrow defendant's car. Defendant testified that it was not true that he would not lend his car to Marc.

Defendant, Marc, and Y.T. went to R.H.'s house. After going into R.H.'s house, defendant came back outside and saw his Expedition was gone. Defendant assumed Marc had taken it. Defendant had left the car keys in the ignition and his cell phone in the car. Marc "just took off with the phone in the car." R.H. and defendant went to the car show at Miller Park at 2:15 or 2:20 p.m.

Defendant was at the car show for about an hour, by which time Marc had arrived with the Expedition. Defendant, Marc, and R.H. went back to R.H.'s house. Marc wanted to go look for a car to buy, and defendant left and went to McClatchy Park.

At McClatchy Park, defendant interacted with someone wearing a "germ" shirt. Defendant testified that a shirt with "germ" on it is gang-related, pertaining to south Sacramento. He told the person to take the shirt off because it was disrespectful; "you just don't wear it in our neighborhood." According to defendant, people have died because of that shirt: "People have been killed on our side and on their side." On cross-examination, defendant acknowledged that, when he referred to "our side," he was referring to the Oak Park Bloods, and when he referred to "their side," he was referring to rival gang members.

Defendant testified that a video showed Marc with a Beretta Nano handgun and defendant with an SR22 Ruger. Defendant knew Marc had the Beretta because "we got the gun for him, and I already had a gun. So I didn't need a gun." The Ruger was defendant's gun. Defendant could not recall the last time he had seen the Beretta, but he assumed Marc still had it. He did not know it was in his vehicle under the center console.

12

Defendant did not know H.C., but he was aware that H.C. had died because he saw Marc's post about it on social media. H.C. was killed by Del Paso Heights Bloods, enemies of Oak Park Bloods. Asked if Marc was upset about H.C.'s death, defendant responded that everyone was.

On cross-examination, defendant acknowledged that the Expedition that appeared on the surveillance videos, and that was used in the killing of the victim, was his vehicle. He also acknowledged that the Beretta Nano handgun used in the killing was "our gun," that "we had the gun," and that it had been in his house. Defendant also acknowledged a text exchange on December 22, 2019, including a photo of the Beretta handgun in which he stated he had a new gun. He specifically acknowledged the text message he sent did not say "Marc got a new gun," it said, "I got a new gun."

Defendant also acknowledged driving his Expedition at McClatchy Park, as seen on the surveillance video, and using his cell phone while at McClatchy Park. He acknowledged being at McClatchy Park, wearing a black T-shirt, getting out of his car, and walking around.

Defendant testified he had never been to Traction Avenue, he did not drive by an apartment complex on Traction Avenue on January 1, 2020, he did not fire a gun out of his vehicle, and he did not kill the victim.

*Verdict and Sentencing*

The jury found defendant guilty of murder in the first degree and found true the allegations that the murder was committed by means of discharging a firearm from a motor vehicle with the intent to inflict death, and that, in committing the murder, defendant personally discharged a firearm causing the victim's death. The trial court sentenced defendant to life without the possibility of parole for murder in the first degree and an additional 25 years to life for the firearm enhancement.

DISCUSSION

I

*Admission of TraX Evidence*

A.     *Additional Background*

Daniel Garbutt, a criminal investigator, worked in the cybercrimes unit of the Sacramento District Attorney's office, and was an expert on call detail records and geolocation.  Garbutt testified about the TraX program created by ZetX.  TraX imports call detail records from a cellular provider, and, using Google Earth, creates a visualization of the location of the cellular tower to which a mobile phone connects, the direction the side or sector of the tower is facing, and the approximate coverage area of that cellular tower.  TraX provides a general location, not an exact location, where a cell phone is likely to have been at the time of the connection.

Garbutt prepared separate visual presentations using the cell phone records for defendant's cell phone and Marc's cell phone by entering their call detail records into the TraX program, which then displayed the results on Google Earth maps.  All of the calls mapped were placed or received on January 1, 2020.

Describing the TraX presentation for defendant's cell phone, Garbutt testified that defendant's cell phone received a call at 1:21 p.m.  At the time, defendant's cell phone was in or near the red-shaded coverage area which included defendant's address on South Land Park Drive.  The next call connected to a cell tower well to the north and east of the prior call.  The call, placed at 2:56 p.m., was an outgoing call and the duration was seven seconds.  Triangle Park was in the red coverage area of this cell tower.  The next call, an incoming call, connected at 4:09 p.m. with a cell tower to the south of the previous call.  Garbutt believed that McClatchy Park was within the area of that cell tower's red coverage area.

Turning to Marc's cell phone, at 2:42, 2:52, 2:56, and 3:11 p.m., Marc's cell phone placed or received calls that connected to a cell tower in the south Sacramento area east

14

of Route 99 and south of U.S. Route 50. The TraX presentation showed that Triangle Park was well north of the location of this cell tower, far outside its expected coverage area. According to Garbutt and the TraX presentation, the 2:56 p.m. call connected to a cell tower that included in its coverage area R.H.'s address on 59th Street in the Tahoe Park area.

In his testimony, defendant agreed that Garbutt's cell tower evidence confirmed that he was in Oak Park at that time of the McClatchy Park interaction. Defendant also did not dispute that his cell phone was in the area of Triangle Park at the time of the shooting. However, he testified that he did not have his cell phone at that time because he had left his cell phone in his Expedition before Marc drove off in the vehicle.

B.      *Defendant's Contentions and* Kelly

Defendant argues that the trial court erred in admitting the TraX evidence and Garbutt's expert testimony about it. He asserts that, at a pretrial hearing, the prosecution failed to satisfy any of the three prongs required under *People v. Kelly* (1976) 17 Cal.3d 24 for the admission of novel scientific evidence.

Under the *Kelly* inquiry " 'when faced with a novel method of [scientific] proof, [courts] have required a preliminary showing of general acceptance of the new technique in the relevant scientific community' before the scientific evidence may be admitted at trial. [Citations.] The *Kelly* 'approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 831, fn. omitted.) Under the *Kelly* test, "the proponent of such evidence must establish (1) the new methodology is reliable by showing it has gained general acceptance in the relevant scientific community; (2) the witness furnishing the testimony is qualified as an expert to give an opinion on the subject; and (3) correct scientific procedures were used in the particular case." (*People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1194.)

15

Relevant to the first *Kelly* prong, we may consider, among other things, "published California decisions and decisions from other jurisdictions." (*People v. Davis* (2022) 75 Cal.App.5th 694, 712.) Defendant is correct that there is no published California appellate opinion concluding that TraX evidence has achieved general acceptance in the relevant scientific community, although there are cases from other jurisdictions that are relevant to that inquiry. (See *United States v. Reynolds* (6th Cir. 2023) 86 F.4th 332; *Wells v. State of Texas* (Tex.Ct.App. 2023) 675 S.W.3d 814, review granted Jan. 24, 2024, PD-0669-23; *Walker v. State of Florida* (Fla.Dist.Ct.App. 2020) 308 So.3d 193.) Defendant also argues, relevant to the second prong, that Sy Ray, who testified at the *Kelly* hearing, was not qualified to testify as an expert on the issue of general acceptance in the scientific community because such an expert, among other things, "must . . . be 'impartial,' that is, not so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community." (*People v. Brown* (1985) 40 Cal.3d 512, 530, revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538.) Ray founded ZetX and created TraX, only recently selling ZetX to LexisNexis, and he currently holds a position as a director of market planning for LexisNexis.

An appellant has the burden of demonstrating both error and resulting prejudice. (See, e.g., *People v. Coley* (1997) 52 Cal.App.4th 964, 972; see also Cal. Const., art. VI., § 13.) Under the circumstances of this case, we conclude it is more expeditious to assume, without deciding, that the TraX evidence was subject to a *Kelly* inquiry and that the trial court erred in admitting the TraX evidence over defendant's *Kelly* objections, and proceed directly to a consideration of prejudice. We conclude that, even if the trial court erred in admitting this evidence, any such error was harmless.

C.    *Applicable Standard of Review*

Defendant acknowledges that, in considering prejudice resulting from the erroneous admission of DNA analysis following a *Kelly* hearing, the California Supreme

Court in *People v. Venegas* (1998) 18 Cal.4th 47 employed the *Watson* test for prejudice (see *People v. Watson* (1956) 46 Cal.2d 818, 836). Under *Watson*, an error "requires reversal only if it is reasonably probable the verdict would have been more favorable to defendant in the absence of the error." (*Venegas*, at p. 93, citing *Watson*, at p. 836.) However, he argues that the *Chapman* harmless beyond a reasonable doubt standard for federal constitutional error (see *Chapman v. California* (1967) 386 U.S. 18, 24) should apply here because the admission of the TraX evidence rendered his trial fundamentally unfair and violated his due process rights. He further asserts the error was prejudicial under any standard.

We are not persuaded that the introduction of the TraX evidence rendered defendant's trial fundamentally unfair or violated his due process rights. "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.) Defendant has not made such a showing here. Guided by our Supreme Court, we apply the *Watson* standard for evaluating prejudice based on the hypothetically erroneous admission of evidence after a *Kelly* hearing. (See *People v. Venegas, supra*, 18 Cal.4th at p. 93; see also *People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"].)

D.    *Prejudice*

It was undisputed at trial that the victim was fatally shot from defendant's Ford Expedition after that vehicle passed by the location several times. The gun used in the killing was a nine-millimeter Beretta Nano handgun eventually found beneath the center console of defendant's Expedition. Two cartridge casings found in the Expedition and a cartridge casing found at the crime scene were all fired using this firearm.

Defendant appears on a video handling the Beretta Nano handgun. While defendant testified that the Beretta was Marc's gun, in addition to the facts that the gun was found in defendant's vehicle, and defendant appeared on video with the gun, he also referred to the Beretta handgun as "our gun" and testified that "we had the gun." Additionally, defendant acknowledged a text message exchange, which included a photo of the Beretta handgun, in which he stated, "I got a new gun." The message did not say "Marc got a new gun."

Thus, the victim was shot and killed by an assailant in defendant's vehicle with a handgun defendant acquired and which was later found in defendant's vehicle.

M.G., a witness to the shooting, did not affirmatively identify anyone in a six-pack photo lineup. However, she gravitated to two photographs and felt "pretty strongly on one." She was most inclined towards defendant's photograph as a possible match to the shooter.

After the shooting, law enforcement traced the Expedition's travels through Sacramento. The Expedition left Traction Avenue, drove onto Del Paso Boulevard southbound which eventually turned into 12th Street, and continued traveling south at 9th Street and Capitol Avenue. Approximately 20 minutes later, at 3:29 p.m., it passed a license plate reader at Riverside Boulevard and Broadway. It arrived at McClatchy Park just before 4:00 p.m.

Defendant appears in a surveillance video recorded at McClatchy Park at 3:52 p.m., arriving in the Expedition. He was wearing a black shirt, as was the shooter,

18

according to L.G.'s statement to police, and the person driving the Expedition as seen on surveillance video from an apartment building on Traction Avenue.  The McClatchy Park surveillance video is corroborated by a video on defendant's cell phone.  Defendant acknowledged being at McClatchy Park in his Expedition at this time, getting out, walking around, and interacting with someone.  Thus, defendant was at McClatchy Park with his Expedition, the vehicle used in the shooting, 58 minutes after the ShotSpotter activation alerted to gunfire on Traction Avenue, wearing the same color shirt as the shooter.

A text message sent from defendant's cell phone approximately nine hours after the shooting stated:  "[G]o slide through and slap some bitch i aint gone lie i been on some hotshit this hole week on fab."  Sergeant Putman testified "slide" usually means driving through enemy territory or enemy locations and "[s]lap some bitch" "is a code for shoot someone."  Sergeant Putman testified this text exchange was "almost an exact description" "of what happened on Traction Avenue . . . ."

Regarding a potential motive, defendant testified he was an "affiliate" of the Oak Park Bloods, he considered himself part of the Oak Park Bloods, and he also "claim[ed] FAB," a subset of the Oak Park Bloods.  Defendant had numerous tattoos that could be deemed gang tattoos.  He had tattoos memorializing friends who were gang members or affiliates who had died.  Defendant also posted on social media about friends who were Oak Park Bloods members who had died or were incarcerated.

The killing of the victim here occurred the day after H.C., an Oak Park Bloods member, was killed by the rival Del Paso Heights Bloods.  The location around Triangle Park on Traction Avenue, where the shooting occurred, was described by law enforcement as Del Paso Heights Bloods territory and as a Del Paso Heights Bloods stronghold.

Defendant testified he did not personally know H.C. and suggests it was Marc, a validated Oak Park Bloods gang member, who had a personal motive to want to kill

19

someone in Del Paso Heights Bloods territory. Defendant relies on Marc's social media post that had a photo of H.C. and stated, "Over you I want them all dead[.] Love you blood[.] I can't stop crying." Additionally, defendant testified that he sometimes would be mistaken for Marc. Y.T. and defendant both testified that defendant and Marc looked similar. Defendant also emphasizes that the jury sent a note requesting to see photographs of the brothers, suggesting this indicated the jurors wanted to see how similar they looked to one another.

However, the evidence establishes defendant had a stronger gang affiliation than he acknowledges, suggesting he too had a motive based on retaliation against rival gang members or people in rival gang territory. He was an Oak Park Bloods "affiliate," he considered himself part of the Oak Park Bloods, and he also "claim[ed] FAB." He also recounted his encounter with someone in McClatchy Park, in which he made the individual take off a gang-related shirt because it was disrespectful, and "you just don't wear it in our neighborhood." Defendant stated that people have been killed on both sides because of such a shirt, and when he referred to "our side," he was referring to the Oak Park Bloods, and when he referred to "their side," he was referring to rival gang members.

Furthermore, in contrast to defendant's testimony that he did not know H.C., Y.T. testified that both Marc and defendant knew H.C., and that everybody was upset he was murdered. Defendant knew H.C. had been killed. And the fact that Marc had a motive to want to shoot someone in Del Paso Heights Bloods territory does not mean that defendant did not.

Defendant testified that Marc took his Expedition when they arrived at R.H.'s house, that defendant went to a car show with R.H. at 2:15 or 2:20 p.m., and that Marc arrived at the car show with the Expedition approximately an hour later, thus at 3:15 or 3:20 p.m. He testified he had never been to Traction Avenue, he did not fire a gun out of his vehicle, and he did not kill the victim. However, Y.T. testified that defendant never let

20

Marc use his SUV because Marc did not have a driver's license. Y.T. also testified that, after they went to R.H.'s house, defendant left for some time because "he had to go do something." She testified that, from the time she woke up on January 1, 2020, until the next morning, she and Marc were never apart. She and Marc were not in the area where the shooting occurred and Marc did not shoot anyone.

We conclude it is not reasonably probable the jury would have reached a verdict more favorable to defendant in the absence of the admission of the TraX evidence. (See generally *People v. Watson, supra*, 46 Cal.2d at p. 836.) The TraX evidence, and the prosecutor's statements about it to the jury, which defendant also emphasizes, purported to show that, at the time of the shooting, defendant's cell phone was connected to a cell tower with a coverage area that included the location of the shooting. Significantly, defendant did not maintain that his cell phone was not in the area of the shooting at the relevant time or that the TraX evidence was inaccurate. Instead, he testified he was not in possession of his cell phone at that time because he had inadvertently left it in the Expedition when Marc drove off. Thus, the TraX evidence only purported to establish a fact that was not contested and that was either irrelevant to or supported the defense. We conclude that it is not reasonably probable that the jury would have reached a different verdict in the absence of the TraX evidence. Thus, even if the trial court committed an error in admitting the TraX evidence, any such error was harmless under *Watson*.

## II

### *Garbutt's Testimony as an Expert User of the TraX Program*

Alternatively, defendant asserts that the trial court erred in allowing Garbutt to testify as an expert user of the TraX program. Defendant maintains that, even if the TraX evidence was admissible, the prosecution was required to present the testimony of an expert who could educate the jurors on the underlying science of TraX, address its acceptance in the relevant scientific community, and demonstrate that TraX functioned properly in this case.

21

Because we have assumed the admission of the TraX evidence was an error, we necessarily assume it was in error to admit Garbutt's testimony about the TraX evidence. However, we have undertaken our assessment of prejudice in part I related to the admission of the TraX evidence. The analysis of harmlessness in considering the assumed error in admitting Garbutt's testimony describing what that evidence established is the same. For the reasons explained fully in part I.D., it is not reasonably probable that the jury would have reached a different verdict in the absence of Garbutt's testimony describing what the TraX evidence illustrated.

III

*Admission of the Drawing of the Victim*

A.     *Additional Background and Defendant's Contentions*

Exhibit 42 is a drawing of what appears to be an adult male on the ground, supine. There is a young child or infant on top of him, and the adult has his right arm around the child and his right hand on the child's back. There is a "sad face" shedding a single tear in the lower right corner of the drawing. And there is what appears to be blood, in crimson, coming from the adult's head. The text at the top of the page states: "Even Holding A Baby We Are Not Safe."

During his trial testimony, L.G. testified the victim was not holding his daughter when he saw him before the shooting, he did not know if he was holding the child at the time he was shot, and he was not holding his daughter when he was on the ground after the shooting, but that his daughter was on top of him. L.G. also testified he did not draw a picture of the victim's body on the ground holding his baby with blood coming out of his head. On cross-examination, he testified he did not remember if he drew such a picture.

During Sergeant Culp's testimony, after an unreported sidebar conference, the prosecutor showed Sergeant Culp exhibit 42. Sergeant Culp testified that L.G. had drawn the picture and told him, "[t]hat was the victim."

22

Explaining what occurred during the sidebar conference and why it allowed the drawing to be admitted despite previously excluding it under Evidence Code section 352, the trial court stated that L.G. had testified in an ambiguous, vague, and inconsistent manner, and denied seeing the victim holding the child. Therefore, the court granted the prosecution's request to show the drawing, and the drawing was admitted into evidence.

Defendant argues that the trial court erred in admitting L.G.'s drawing into evidence. Defendant argues the drawing had no probative value, and, even if it had some marginal probative value, such was substantially outweighed by the substantial danger of undue prejudice. We disagree.

B.      *Analysis*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Contrary to defendant's contentions, the drawing was not entirely lacking in probative value. Whether the victim was holding a child at the time he was shot could have some tendency in reason to prove that defendant specifically targeted the victim, to the exclusion of anyone else, and was intent on committing the killing notwithstanding the presence of a young child. These showings could have some tendency in reason to prove defendant committed willful, deliberate, and premeditated murder. (See § 189, subd. (a).)

At trial, L.G. testified the victim was not holding his daughter when he saw him before the shooting, he did not know if he was holding the child at the time he was shot, and he was not holding his daughter when he was on the ground after the shooting. However, he also testified that the victim's daughter was on top of the victim after the shooting. The drawing, which depicts the victim's right arm holding the child with his right hand on the child's back had some tendency in reason to prove the victim was in

fact holding the child. True, as defendant argues, the drawing purports to depict events *after* the shooting rather than *during* or *immediately prior to* the shooting. However, the trier of fact could infer that if the victim, who had been shot through the head, was holding the child as he lay supine on the ground, he may have been holding the child when he was shot.

The drawing was also probative of L.G.'s credibility. (See Evid. Code, § 210 [relevant evidence includes evidence relevant to a witness's credibility].) In his interview with law enforcement, L.G. said the victim had been hit by gunfire while he was "with a baby." At trial he testified the victim was not holding his daughter when he saw him before the shooting, and he was not holding his daughter when he was on the ground after the shooting. He also testified, however, that he saw the victim on the ground after the shooting, and his daughter was on top of him. This arguably could give rise to a discrepancy in L.G.'s account of the shooting and its immediate aftermath. Moreover, L.G. testified at trial that he did not create the drawing, and later, on cross-examination, that he did not recall whether he drew the picture. However, according to Sergeant Culp, L.G. had drawn the picture and he told Sergeant Culp that the picture represented the victim.

Thus, we conclude that the evidence was relevant and had some probative value.

Notwithstanding its relevance, the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Jones* (2017) 3 Cal.5th 583, 609.)

24

Defendant asserts that under Evidence Code section 352, the drawing should have been excluded as cumulative. He emphasizes that there was other evidence to establish that the shooter harbored malice as demonstrated by shooting the victim notwithstanding the presence of a child.

Cumulative evidence may be excluded under Evidence Code section 352 where it would require undue consumption of time. (Evid. Code, § 352; *People v. Burgener* (1986) 41 Cal.3d 505, 525, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) The presentation of exhibit 42 did not pose any danger of undue consumption of time. We conclude the trial court did not abuse its discretion in admitting exhibit 42 on the grounds that it was cumulative. (See *People v. Lucas* (1995) 12 Cal.4th 415, 449-450 [trial court did not abuse its discretion in admitting photographs of murder victims notwithstanding the defendant's argument that the photographs were cumulative to the coroner's testimony].)

Defendant also argues the drawing was highly prejudicial and inflammatory. "Prejudice" as the term is used in Evidence Code section 352 refers to " 'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 807.) The drawing does have the potential to elicit an emotional response. However, given the probative value of the evidence both to the shooter's intent and to L.G.'s credibility, we cannot conclude the probative value of the drawing was "substantially outweighed by the probability that its admission" would "create a substantial danger of undue prejudice." (Evid. Code, § 352; see *People v. Tran* (2011) 51 Cal.4th 1040, 1047; *People v. Holford* (2012) 203 Cal.App.4th 155, 167 [our Supreme Court "has emphasized the word 'substantial' " in Evid. Code § 352].)

Having viewed the drawing, and having considered the purposes for which it was admitted, we cannot conclude that, in admitting exhibit 42, " ' " 'the trial court exercised

its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Jones, supra*, 3 Cal.5th at p. 609.)

IV

*Gang Evidence*

A.      *Additional Background and Defendant's Contentions*

Prior to trial, defendant moved to exclude all gang evidence on Evidence Code section 352 grounds, among others.  At argument on in limine motions, the prosecutor stated that he sought the admission of a limited scope of evidence to establish why defendant "would do what he did . . . ."  The prosecutor elaborated that, other than the "gang aspect" of defendant being affiliated with a gang and the victim being shot in rival gang territory, there was no other explanation for what appears to be a targeted homicide. The trial court agreed to the admission of gang evidence insofar as it was relevant to motive.  The court stated that the evidence had significant probative value because, other than the gang-related motive, the crime would appear to be a random shooting, the lack of any apparent motive would undermine the prosecution's case, and the prosecution was entitled to present its case with relevant evidence.

Defendant argues that the trial court committed prejudicial error in admitting gang evidence.  According to defendant, even if this evidence was marginally relevant, it should have been excluded as more prejudicial than probative under Evidence Code section 352.  We disagree.

B.      *Analysis*

"In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' [Citation.]  '[E]ven where gang membership is relevant,' however, 'because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it.' [Citations.]  On the other hand, ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its

26

prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' [Citation.] On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible." (*People v. McKinnon* (2011) 52 Cal.4th 610, 655; see *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [gang evidence "is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect"].)

Here, we have no difficulty concluding that the gang evidence was highly probative of the motive for the shooting. The victim was shot and killed in what was described by law enforcement as Del Paso Heights Bloods territory and as a Del Paso Heights Bloods stronghold. This occurred the day after an Oak Park Bloods member, H.C., was killed by the enemy Del Paso Heights Bloods. The shooter drove by the area several times before stopping and shooting at least six times at his selected target. The vehicle used in the shooting was quickly traced back to defendant, and the murder weapon was found in the vehicle. As it turned out, defendant described himself as an "affiliate" of the Oak Park Bloods, and as a part of the Oak Park Bloods, and he also "claim[ed] FAB," a subset of the Oak Park Bloods. Defendant also had a gang-motivated interaction with an individual at McClatchy Park less than an hour after the shooting, ordering the individual to remove his "germ" shirt because it was disrespectful for gang-related reasons.

Defendant suggested his brother Marc may have been the shooter because he took defendant's Expedition prior to the shooting. Marc was a validated member of the Oak Park Bloods.

There was no suggestion of any motive for the killing other than the possibility of gang violence. The evidence of gang affiliation and activity was highly relevant to the issue of motive.

We disagree with defendant's contention that the gang evidence was improperly used as proof of identity despite being admitted for motive. Defendant's Expedition was used in the shooting, and the murder weapon was a handgun he had acquired, which was found in his vehicle. Within an hour of the shooting, defendant was seen on surveillance video in the Expedition wearing the same color shirt as the shooter. Moreover, while no one affirmatively identified defendant in a photo lineup, one witness to the shooting was most inclined towards defendant's photograph as a possible match to the shooter. Defendant's identity as the suspected shooter was firmly established.

Defendant also claims that the probative value of the gang evidence was "further diminished by the fact that it was undisputed that appellant merely had an affinity for the [Oak Park Bloods], he was not a member or associate." As stated, the trial evidence clearly indicates defendant had a stronger gang affiliation than he acknowledges. He was a self-professed Oak Park Bloods "affiliate"; he acknowledged considering himself a part of the Oak Park Bloods; "claim[ed] FAB"; and, when discussing the "germ" shirt incident, he acknowledged that, when he referred to "our side," he was referring to the Oak Park Bloods, and when he referred to "their side," he was referring to rival gang members. The mere fact that defendant may not have been a *validated* Oak Park Bloods member does not immunize defendant from the admission of gang evidence where probative and not unduly prejudicial. Defendant cites to no authority, nor are we aware of any, suggesting that gang evidence may only be admitted in prosecutions of validated gang members.

Moreover, this is not a case where voluminous or highly inflammatory gang evidence was introduced. (See, e.g., *People v. Albarran, supra*, 149 Cal.App.4th at pp. 227-228 [while some gang evidence was relevant to motive and intent, "other extremely inflammatory gang evidence was admitted which had no connection to these crimes"; certain gang evidence had little or no bearing on any issue related to the defendant's guilt and approached the level of "overkill"].) The evidence introduced here

was limited. It did not pertain to gang crimes or acts of violence. It pertained largely to defendant's tattoos, associates, and communications.

The gang evidence admitted here was highly relevant and not especially inflammatory. The trial court did not abuse its discretion in admitting it over defendant's Evidence Code section 352 objections.

## V

### *Cumulative Error*

Defendant argues that the cumulative effect of the errors he alleges denied him his right to due process and a fair trial and warrants reversal. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless individually, their cumulative effect may require reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.) We have found no potential prejudice, based on the same analysis, when considering defendant's intertwined claims of error related to the admission of the TraX evidence and Garbutt's testimony describing that evidence. We have found that defendant's other claims of error are not meritorious. Thus, there are no additional errors to aggregate with the hypothetical error related to the TraX/Garbutt evidence. We therefore reject defendant's cumulative error claim. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6.)

## VI

### *Abstract of Judgment*

Defendant asserts, and the People agree, that the abstract of judgment must be corrected because it reflects a $4,000 parole revocation restitution fine, and yet (1) the trial court did not orally impose this fine in pronouncing judgment, and (2) his sentence—life without the possibility of parole—does not include a period of parole.

In pronouncing judgment, the trial court did not impose a parole revocation restitution fine, and thus it is not a component of the judgment. (See *People v. Bongani*

29

*El* (2021) 65 Cal.App.5th 963, 967 [the "oral imposition of sentence constitutes the judgment in an action, and the minutes cannot add anything substantive to the oral pronouncement"].) Moreover, where, as here, defendant is sentenced to life without possibility of parole and to a sentence enhancement, but not to any determinate term on another substantive count including a potential period of parole (see § 1202.45, subd. (a)), a parole revocation restitution fine under section 1202.45 is unauthorized (see *People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183; see also *People v. Battle* (2011) 198 Cal.App.4th 50, 63). We shall order the abstract and minute order corrected to delete this fine.

### DISPOSITION

The judgment is affirmed. The trial court is directed to correct the minute order dated March 3, 2023, and the abstract of judgment to delete the parole revocation restitution fine. The trial court is further directed to send a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

\s\ ,
Krause, J.

We concur:

\s\ ,
Hull, Acting P. J.

\s\ ,
Renner, J.

30